GALLAGHER et al. v. CITY OF NEW YORK.

(District Court, E. D. New York. December 11, 1911.)

SALVAGE (§ 31*)—SALVAGE SERVICES—COMPENSATION.

An award of $500 made to a tug for salvage services rendered to city scows which were on fire, and had drifted from their moorings in East River, the services of the tug having been commenced before the arrival of the fireboats, and when there was some danger to other shipping and under circumstances of danger to herself.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 75-77; Dec. Dig. § 31.*

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage by John J. Gallagher and others, owners and crew of the tug Gallagher, against the City of New York. Decree for libelants.

Foley & Martin, for libelants.

Archibald R. Watson, Corp. Counsel (George P. Nicholson, of counsel), for City of New York.

CHATFIELD, District Judge (orally, at close of case). The time at which the alarm of fire was given was definitely fixed at 4:28 p. m., and the clocks of the fire department will be presumed to be correct. Previously to 4:28 the scows at the dump at Thirtieth street had gotten on fire, and the fire was sufficient to burn their moorings, and to cause the sending in of an alarm. This alarm was carried by a man to a box at Twenty-Ninth street, and the two fireboats Hewitt and Strong started for the

fire, the Hewitt from Brooklyn and the Strong from Grand street, New York. According to the record the Hewitt arrived at the fire at 4:36; that is, taking 8 minutes to cross the river. The Strong arrived about 12 minutes after receiving the alarm; that is, 3 or 4 minutes behind the Hewitt. At the time of the arrival of the Strong the scows had drifted out in the river under the influence of what seems to have been a fairly strong northwest wind, which, blowing off shore, would cause them to move more rapidly as they got further out in the stream. Whatever tide there was was down the river, but the drift of the scows showed that the effect of the tide was not great. Other boats, in the form of yachts, were lying in the river, but not in such proximity that immediate danger was imminent, and the evidence does not seem to show that the drift of the burning scows was sufficient to cause them to reach the yachts before the arrival of the fireboats, as the tugs did not tow the burning scows any great distance before the arrival of the fireboats in any event.

According to the testimony of the Gallagher, she discovered the burning scows when they were away from the docks and either at the arrival of the Gallagher, or some time while she was proceeding to the fire, the scows were estimated to be 150 feet from the shore; Capt. Bouchard estimating that they were 150 feet from the shore when he started from Forty-Second street. The Port Chester left Thirty-Fifth street, and, turning down river across the path of the Gallagher, arrived at the scows on a course to port of the Gallagher, and, passing around the off shore end of the scows, proceeded almost immediately to follow and capture scow 50, which by that time was drifting away. The Gallagher, being in shore, proceeded to the stern of the scow, at that time the scows drifting substantially broadside up and down river. The Gallagher was separated from the fireboat by the smoke and blaze upon the scows, of which the testimony shows there was considerable before the scows left the dock and all the time that they were passing out into the river, and this amount of smoke seems to have been increased upon the arrival of the various boats that furnished the streams of water and to have continued until the scows were taken back to shore, when nothing but a smoldering fire in the cargo remained, which was played upon for an hour by the land company.

The Hewitt was apparently some distance from the burning scows at the time of the arrival of the Gallagher and the Port Chester. As she came up river into the smoke, which was blowing approximately across and down river, she passed between the scows, whose lashings were then either burned, or had been burned previously, and the shock of her impact separated the scows. She took her ordinary position of duty in the face of the fire; that is on the leeward side of the scow, with the result that she was not seen by the Gallagher, nor could she see the Gallagher or anything else except the fire.

The Strong arrived some time after, and by that time scow 20 had swung around so that she was bow upstream, and the Strong, coming up river on the inside or port side of the scow, assumed a position opposite the Hewitt, and lapping the Gallagher's bow. Up to that time

the Gallagher had been playing water on the fire. Also for several moments the Hewitt had been directing a considerable amount of water upon the scow and its contents, and yet the fire was sufficient to make the Strong assume control, and to also direct streams of water on the scow to put out the fire. Whatever had been the fire on barge 50, it had resulted in merely blistering her port side, and had been extinguished by the Hewitt before 50 had floated away.

The presence of a Baltimore & Ohio tug, which, with her tow, attempted to maneuver sufficiently close to reach the scows with a stream of water and at the same time to keep out of the zone of danger, does not seem to have had any effect upon the situation, and the tug passed up the river before the arrival of the Hewitt, but her presence indicates that the Gallagher arrived prior to the time that the Hewitt passed between the scows.

The most difficult question of fact is to account for the failure of the Port Chester to know the whereabouts of the Gallagher and the Hewitt, and to account for its own movements before it pursued the floating scow. If the Port Chester, as its captain says, had gone directly around the bows of the scows and found the scow floating, then the Port Chester, which got to the fire ahead of the Gallagher, could not have arrived until after the Hewitt had passed in between the scows. On the other hand, if the Port Chester and the Gallagher got to the fire shortly before the Hewitt, then the Port Chester could have accomplished very little, and must have taken up a position very near the bow which it relinquished about the time the Hewitt arrived and went between the scows. Therefore the testimony of the Port Chester throws very little light on the situation one way or the other.

I think the facts show that the arrival and movements of the Hewitt saved scow 50; that the action of both the Hewitt and the Strong saved a considerable destruction of the scows; and that their presence overcame the probability that the fire would spread to other boats.

As to the maneuvering of the boats in getting the scows back to the shore, I think both sides are correct in their recollections, but that they were working at cross-purposes, the Gallagher attempting to tow the scows in under a different idea from that of the fireboats, the result being that under the influence of the three boats the scows were gradually worked towards shore, and, with a trifling incident of snapping a line and one or two false maneuvers, they were moored at the dock as successfully as if the three boats had acted in unison.

Considering all the facts, I think that the Gallagher acted with considerable promptitude and with a correct estimate of the danger of the situation and under such circumstances that her services should be rewarded. She accomplished salvage to the extent of rendering assistance of some value under circumstances of danger both to herself and to other craft as well as to the scows, and she rendered this service long enough (before the Hewitt was in a position to make her services unnecessary) to justify the allowance of an award which would encourage such action.

I think that the witnesses on board the Hewitt and the Strong have been telling the truth, and that the testimony of the captain of the

Gallagher is also trustworthy; that whatever discrepancies exist arise from an attempt to recall the situation and not from intentional misstatement on any one's part. I think this is a salvage case.

It appears that the scow was worth $4,200; also that the service of the Gallagher affected merely scow 20. The amount of damage that scow 20 suffered, or that it was possible to incur, was not sufficient to form a basis for the compensation for salvage service that I think the Gallagher is entitled to receive. If it were merely the question of the damage done or the cost of repair, I should say that a 5 per cent. award would be all that would be justifiable, but, considering the risk and the character of the service that the Gallagher attempted to render and did render, I think I will allow $500, which will be about 12 per cent., which I think a fair compensation for the services. I cannot view salvage to either rubbish or garbage scows in the same category that I would salvage of vessels that are either carrying or are for carrying passengers. That, of course, must be taken into account, because the captain of the Gallagher knew what kind of vessels he was after, but the award is based partly upon the risk to other craft.

I think that the ordinary rule for the division may stand.